# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Fair Isaac Corporation,                                  Civil No. 05-2081 (DWF/SRN)
a Delaware corporation,

                        Plaintiff,

                                                         **MEMORANDUM**
v.                                                       **OPINION AND ORDER**

International Business Machines Corporation,
a New York corporation,

                        Defendant,

and

International Business Machines Corporation,
a New York corporation,

                        Counter-Claimant,

v.

Fair Isaac Corporation,
a Delaware corporation,

                        Counter-Defendant.

_____

Craig D. Diviney, Esq., Devan V. Padmanabhan, Esq., Sri K. Sankaran, Esq., Ronald J.
Brown, Esq., Surya Saxena, Esq., and Todd R. Trumpold, Esq., Dorsey & Whitney LLP,
counsel for Plaintiff and Counter-Defendant.

Donald J. Curry, Esq., and Marc J. Pensabene, Esq., Fitzpatrick Cella Harper & Scinto –
NY; and Justice Ericson Lindell, Esq., and Robert R. Weinstine, Esq., Winthrop &
Weinstine, P.A., counsel for Defendant and Counter-Claimant.

_____

**Introduction**

The above-entitled matter came before the undersigned United States District Judge pursuant to a Motion for Preliminary Injunction brought by Plaintiff Fair Isaac Corporation ("Fair Isaac"). In its First Amended Complaint (the "Complaint"), Fair Isaac asserts the following counts against Defendant International Business Machines Corporation ("IBM"): (1) patent infringement of United States Patent No. 6,865,566 (the "'566 Patent"); (2) breach of contract; and (3) misappropriation of trade secrets. In an Order dated March 16, 2006, the Court denied Fair Isaac's Motion for Preliminary Injunction. The reasons for that denial are set forth below.

**Background**

The '566 Patent, issued on March 8, 2005, relates to an "Approach for Re-Using Business Rules." ('566 Patent.) Fair Isaac is the assignee of the '566 Patent. Fair Isaac is a company involved in the design and development of decision management technology. (Compl. at ¶ 6.) One of Fair Isaac's products is the Blaze Advisor business rules software. This product allows businesses to automate, manage, and execute their decision-making processes without human intervention at every step. (*Id*. at ¶ 7.)

In June 2000, Fair Isaac launched version 3.0 of Blaze Advisor. Version 3.0 included new features that allowed business managers to modify the parameters that guide the decision-making process of the software, without requiring the help of computer programmers or other technical staff. These user-friendly templates that allow the business manager to define rule structures and execute business decisions in Blaze Advisor are purportedly the subject of the '566 Patent.

2

On November 12, 1999, IBM and Blaze Software, Inc. ("Blaze Software") entered into a Licensed Works Agreement and a related Statement of Work (the "LWA").  Fair Isaac is the successor-in-interest to Blaze Software's rights under the LWA and Statement of Work.

Under these agreements, Blaze Software licensed its Blaze Advisor product to IBM for use with certain editions of IBM's WebSphere Commerce Suite software.  The parties entered into Amendment #2 to the LWA and Statement of Work on November 20, 2000 (the "SOW2").  By virtue of these agreements, IBM obtained a non-exclusive worldwide license to "prepare and have prepared Derivative Works of the Licensed Work" and to "externally transmit, transfer, distribute and sublicense others to use the Licensed Work and such Derivative Works . . . in any medium or distribution technology only as part of the Products."  The SOW2 defines "Products" as certain versions of IBM's WebSphere Commerce product.  (SOW2 at ¶ 4.1(a).)  The SOW2 defines a "Derivative Work" as "a work that is based on an underlying work and that would be a copyright infringement if prepared without the authorization of the copyright owner of the underlying work."  (LWA at ¶ 1.0; SOW2 at ¶ 2.1.)  The SOW2 also limited the capabilities of Blaze Advisor that IBM could use in Websphere Commerce.  (*See* SOW2 at §§ 4.1(c)(3)(i)-(iii).)  The agreements also provided that the parties may still "design, develop, manufacture, acquire or market competitive products or services."  (LWA at ¶ 14.7.)

The parties do not dispute that prior to entering into the LWA and SOW2, IBM evaluated various vendors' products and determined that it wanted to integrate Blaze

Advisor's rules management capabilities into its WebSphere Commerce products.  After

entering into the LWA and SOW2, IBM first used Blaze Advisor with its WebSphere

Commerce release 5.1 in November 2000, and included it in three components of

subsequent WebSphere Commerce releases.

The parties entered into a Master Relationship Agreement ("MRA") dated

December 18, 2003.  The MRA governs various joint marketing activities between the

parties.  IBM asserts that MRA is still in effect.

IBM contends, at some point, it began to consider canceling the LWA and SOW2

with Fair Isaac because the Blaze Advisor software contained additional, unnecessary

functions that IBM's customers were not interested in.  IBM asserts that it was paying

Fair Isaac a royalty for functionality that its customers did not want.  As a result, on

June 6, 2005, IBM verbally communicated to Fair Isaac that it would not continue using

Blaze Advisor in its WebSphere Commerce products.

IBM contends that it eventually rewrote its WebSphere Commerce components so

that Blaze Advisor's functionality was no longer needed.  IBM asserts that by version

5.6.1 of WebSphere Commerce, all use of Blaze Advisor had been removed.  IBM asserts

that it replaced the rules engine of Blaze Advisor with a less complex JAVA code that

was specialized for the particular needs of WebSphere Commerce.  Fair Isaac, on the

other hand, asserts that after having gained technical knowledge from the relationship

with Fair Isaac, IBM abandoned its relationship with the company and incorporated key

features of Blaze Advisor into IBM's WebSphere products, including the rule templates

that may be modified by a business person rather than a computer programmer.

Fair Isaac contends that IBM's WebSphere Process Server Version 6.0 incorporates many key features that IBM copied from Blaze Advisor, including the use of rule templates.  Fair Isaac asserts that the features that IBM copied from Blaze Advisor are delineated in a document that IBM provided to Fair Isaac in July 2005, titled "WebSphere Process Server V6—Business Rules Technical Overview" (the "WebSphere Document").  (Decl. of Sally A. Holt ("Holt Decl.") ¶ 3, Ex. A.)  In addition, Fair Isaac contends that documents posted on an IBM website after IBM began launching its product confirm that the WebSphere Process Server V6 copies key features of Blaze Advisor.  (Decl. of John T. Riedl ("Riedl Decl.") Ex. H.)

Specifically, Fair Isaac asserts that IBM took the concept of using templates to generate rules.  Fair Isaac sets forth examples of screen shots from the WebSphere Document that demonstrate how a user of the WebSphere software can fill in blanks on the template to define rules that apply, similar to the Blaze Advisor Software.  (*See* Mem. in Supp. of Pl. Fair Isaac Corporation's Mot. for Prelim. Inj. at 11–13.)  In addition, Fair Isaac asserts that page 9 of the WebSphere Document identifies five aspects of WebSphere's rules management component that are taken from Blaze Advisor.  (*Id*. at 13–14; Holt Decl. ¶ 5.)

## Discussion

## I.  Standard of Review

Federal Circuit law governs the issuance of preliminary injunctions in patent cases.  A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."  *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir.

1993).  A decision whether to grant or deny a preliminary injunction is within the sound discretion of the district court.  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338 (Fed. Cir. 2003).  In order to succeed in their request for a preliminary injunction, the moving party must establish their right to a preliminary injunction in light of the following four factors:  (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) balance of harms to the parties; and (4) the public interest.  *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).  A movant must establish the existence of both of the first two factors in order to be granted an injunction.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

Eighth Circuit law and the *Dataphase* test govern the issuance of preliminary injunctions in contract cases.  Under Eighth Circuit precedent, a preliminary injunction may be granted only if the moving party c an demonstrate:  (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  None of the factors by itself is determinative; rather, in each case the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief.  *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987).  The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414,

418 (8th Cir. 1987).  The Eighth Circuit and Federal Circuit factors to consider are essentially the same.

## II.    Analysis

Fair Isaac has moved for a preliminary injunction based on IBM's alleged breach of two contracts with Fair Isaac, IBM's alleged breach of its covenant of good faith and fair dealing, and IBM's alleged infringement of the '566 Patent.

### A.    Likelihood of Success on the Merits

#### 1.    Breach of Contract

Fair Isaac contends that IBM breached its obligations to Fair Isaac under the Second Statement of Work and the MRA.[1]  Specifically, Fair Isaac asserts that IBM breached the Second Statement of Work by distributing the rules management software that IBM developed based on Blaze Advisor, but outside of the WebSphere Commerce Suite.  Fair Isaac maintains that although the Second Statement of Work allowed IBM to create a derivative work based on Blaze Advisor, the contract only allowed IBM to distribute such a derivative work as part of the WebSphere Commerce Suite.  Fair Isaac also contends that IBM breached the MRA by using Blaze Advisor and its related marketing materials to develop a competitive product, and by copying and using Blaze Advisor in a manner that was not related to a joint marketing effort.

IBM, on the other hand, contends that Fair Isaac is unlikely to succeed on the merits of its breach of contract claims.  IBM asserts that in order to prove a breach of the

---

[1]    The contracts are governed by the laws of the State of New York.  (Declaration of Philip Wiley ("Wiley Decl.") ¶ 4, Ex. B at § 3.5(i)).

Second Statement of Work, Fair Isaac must prove that the WebSphere Process Server software is a "copyright infringement" of Blaze Advisor. IBM maintains that Fair Isaac cannot demonstrate a likelihood of success on this issue because Fair Isaac cannot demonstrate that IBM has copied its source code, and because the concepts that Fair Isaac seeks to protect are not original and excluded from protection under copyright law. In addition, IBM contends that Fair Isaac has not offered any specific evidence to support its claim that the MRA was breached.

IBM is correct in asserting that Fair Isaac's claims for breach of contract are based on the premise that IBM prepared a "derivative work" of the licensed Blaze Advisor software and distributed it outside of the scope of the license agreement. The LWA defines a "derivative work" as "a work that is based on an underlying work and that would be a copyright infringement if prepared without the authorization of the copyright owner." (Wiley Decl. ¶ 3, Ex. A at 1.) Thus, in order to demonstrate that IBM breached the LWA in this regard, Fair Isaac must establish that IBM's WPS product is a "copyright infringement" of Blaze Advisor. Fair Isaac does not appear to dispute this point.

In support of its breach of contract claim, Fair Isaac asserts that IBM has copied ten "principles and concepts" from Blaze Advisor. (Mem. in Supp. of Pl. Fair Isaac Corp.'s Mot. for Summ. J. at 16-17.) In order to prevail on a claim of copyright infringement, a plaintiff must establish "ownership of a valid copyright and copying of original elements of the work." *Mulcahy v. Cheetah Learning, LLC*, 386 F.3d 849, 852 (8th Cir. 2004); *see also Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). However, even if IBM did indeed copy these principles and concepts, Fair Isaac has not

established how the features that IBM has allegedly copied are original, copyrightable subject matter and thus protectable by copyright law.  Moreover, Fair Isaac has not offered any evidence that IBM breached the Master Relationship Agreement.  Thus, Fair Isaac has not established a likelihood of success on the merits of its breach of contract claim.

## 2.    Breach of Covenant of Good Faith and Fair Dealing

Fair Isaac also asserts that IBM breached its covenant of good faith and fair dealing by offering a product that incorporates the ideas and expression embodied in Blaze Advisor.  Pursuant to New York law, all contracts contain an "implicit covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289 (N.Y. 1995).  "The implied covenant of good faith encompasses 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Dweck Law Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004) (quoting *Rowe v. Great Atlantic & Pacific Tea Co., Inc.*, 385 N.E.2d 566 (N.Y. 1978)).  The duty prevents either party from doing anything that will destroy or injure the right of the other party to receive the fruits of the contract.  *Id*. (citations omitted).

Here, Fair Isaac asserts that IBM violated its implied covenant of good faith and fair dealing by creating a new work based on the ideas and expressions embodied in the licensed work.  In addition, Fair Isaac contends that IBM used information and documentation about Blaze Advisor for purposes other than the joint marketing of Fair Isaac's and IBM"s products.  Essentially, this is the same conduct that Fair Isaac asserts

resulted in a breach of contract.  Because the conduct that allegedly violates the implied

covenant of good faith and fair dealing is duplicative of an express provision of the

underlying conduct, Fair Isaac has no likelihood of success on the merits of this claim.

*See In re Houbigant, Inc.,* 914 F. Supp. 964, 989 (S.D.N.Y. 1995) (citation omitted).

### 3.    Patent Infringement

"[B]ecause of the extraordinary nature of the relief, the *patentee* carries the burden

of showing likelihood of success on the merits with respect to the patent's validity,

enforceability, and infringement."  *Nutrition 21 v. U.S.*, 930 F.2d 867, 869 (Fed. Cir.

1991) (emphasis in original).  Thus, Fair Isaac must demonstrate, in light of the

presumptions and burdens that will inhere at trial on the merits, that:  (1) it will likely

prove infringement; and (2) its infringement claim will likely withstand IBM's challenges

on the validity and enforceability of the patent.  *Purdue Pharma*, 237 F.3d at 1363

(citations omitted).  If IBM raises a "substantial question" concerning infringement,

validity, or enforceability, a preliminary injunction should not be granted.  *Amazon.com*,

239 F.3d at 1350-51.

An infringement analysis requires two steps.  First, the Court must determine the

meaning and scope of the patent claims asserted to be infringed.  Second, the Court must

compare the properly construed claims to the device accused of infringing.  *Id*. at

1363-64.  Patent claim construction, *i.e.*, the interpretation of the patent claims that define

the scope of the patent, is a matter of law for the court.  *Markman v. Westview

Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1999).

Proper claim construction requires an examination of the intrinsic evidence of record,

including the claims of the patent language, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The terms used in the patent are presumed to carry "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (citation omitted), *cert. denied*, 126 S.Ct. 1332 (U.S. Feb. 21, 2006).  The specification is "the single best guide to the meaning of a disputed term."  *Id*. at 1315.  The specification may prescribe a special definition given to a claim term, or a disavowal of claim scope by the inventor.  *Id*. at 1316.  In such cases, the inventor's intention that is expressed in the specification is dispositive.  *Id*.  The court may use a dictionary or technical treatise to "assist in understanding the commonly understood meaning" of a term, so long as any meaning found in such sources does not contradict the definition that is found in the patent documents.  *Id*. at 1322-23.  In addition, the court may not import limitations from the specification into the claims.  *Id*. at 1323.

For purposes of its preliminary injunction motion, Fair Isaac focuses its infringement analysis on Claim 17 of the '566 Patent.  Claim 17 is a dependent claim of Claim 11 and thus incorporates all of the limitations of Claim 11.  Claims 11 and 17 read as follows:

> 11. A computer-readable medium carrying one or more sequences of instructions for developing rule applications, wherein execution of the one or more sequences of instructions by one or more processors causes the one or more processors to perform the steps of;
>> generating a first template that defines a rules structure for rules that may be executed by a rules engine;

generating a second template describing a first set of tasks that includes
   a first task and an association with said task and said first template;
generating a set of rules based on said first template;
wherein said association between said first task and said first template
   causes execution said set of rules by said rules engine while
   executing said first task; and
wherein the step of generating a second template describing an
   association with said first task and said first template includes the
   step of generating a second template that describes an association
   between said first task and a template group that includes said first
   template.

. . .

17.  The computer-readable medium of claim 11, wherein the said first
template is a rule template.

('566 Patent at c. 13, ll: 22-41; c. 14, ll: 21-22.)

Fair Isaac opened its briefing by asserting that IBM's WebSphere software meets

all of the limitations of Claim 17 (and thus Claim 11) of the '566 Patent.  However, Fair

Isaac does not initially offer any terms of Claims 11 or 17 that require construction, nor

does Fair Isaac attribute any meaning to the terms of the claims.  IBM, on the other hand,

focuses its argument on the "second template" of Claim 11.  IBM asserts that "template"

should be defined as "a reusable pattern, which serves as a starting point for a particular

deliverable or activity."  In addition, IBM asserts that the second template of Claim 11

describes a set of tasks by defining the flow of execution between two or more tasks,

rather than a mere grouping of tasks.  Fair Isaac counters by asserting that the "second

template" of Claim 11 does not require that the template be reusable.  However, Fair

Isaac still does not offer its own proposed construction of the term "template."  In

addition, Fair Isaac asserts that IBM has misconstrued "set of tasks" to include two or more tasks.  Fair Isaac contends that the "set of tasks" may be defined as a single task.

At oral argument, Fair Isaac pointed to the specification of the '566 Patent, which defines "template" as "data that describes an entity that may be executed by a rules engine."  ('566 Patent at c. 3, ll: 44-45.)  Fair Isaac then attempted to cast aside IBM's proposed construction of the term "second template," again offering no construction of its own for the term.

Upon thorough consideration of Fair Isaac's submissions, the Court is unable to construe the claims at issue, much less determine whether infringement has occurred. The Court finds that in light of the incomplete claim construction and infringement analysis provided to the Court, Fair Isaac has not met its burden of demonstrating a likelihood of success on the merits of its patent infringement claim.  Thus, absent further argument on claim construction or a more thorough patent infringement analysis, the Court finds that Fair Isaac is not likely to succeed on its patent infringement claim.

### 4.    Validity and Enforceability of the '566 Patent

Because Fair Isaac has not proved a likelihood of success on the merits of its patent infringement claim, Fair Isaac's motion for preliminary injunction fails.  As a result, the Court need not reach the questions of whether the '566 Patent is valid and enforceable at this preliminary injunction stage of the proceedings.

### B.    Irreparable Harm

As to Fair Isaac's patent infringement claims, irreparable harm cannot be presumed because Fair Isaac has not demonstrated a likelihood of success on the merits

of these claims. *Amazon.com*, 239 F.3d at 1350; *Nutrition 21*, 930 F.2d at 871. With or without this presumption, however, the Court finds that Fair Isaac has not demonstrated that it will suffer irreparable harm that is not compensable by money damages regarding any of its claims.

Fair Isaac primarily asserts that it will be irreparably harmed because IBM's conduct will destroy Fair Isaac's position as a market leader in the field. Fair Isaac's asserted irreparable harm is based on speculation and thus does not justify the Court's grant of an injunction. *Nutrition 21*, 930 F.2d at 871 ("neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial") (citation omitted). In addition, Fair Isaac has not demonstrated that money damages would be an inadequate remedy for its alleged losses. Nor has Fair Isaac demonstrated that IBM would be unanswerable in damages. *Id*. Finally, Fair Isaac has not established that IBM's product directly competes with Blaze Advisor. For these reasons, the Court finds that the record does not support a finding of irreparable harm.

## C.    Balance of the Hardships, and Public Interest

Because Fair Isaac has not demonstrated either a likelihood of success on the merits of its claims or irreparable harm, the balance of hardships weighs in favor of IBM. As to the public interest, although the public interest favors the protection of patent and contract rights, Plaintiffs have not demonstrated that IBM infringed or violated these rights. As a result, the public interest in genuine competition weighs in favor of denying the preliminary injunction.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Plaintiff Fair Isaac Corporation's Motion for Preliminary Injunction (Doc.

No. 12) is **DENIED**.

Dated:  May 9, 2006                    s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       Judge of United States District Court